In re Robert Clair NOLAND, Marilyn Crouch Noland, Debtors.

COMMERCIAL BANK & TRUST CO. OF TULSA, an Oklahoma state banking institution, Plaintiff,

v.

Robert Clair NOLAND, Marilyn Crouch Noland, Defendants.

Bankruptcy No. 87–21819–7.
Adv. No. 88–0020.

United States Bankruptcy Court,
D. Kansas.

May 2, 1989.

Eileen M. Smyth, Charles M. Thomas, of Grier & Swartzman, Kansas City, Mo., for debtors/defendants.

Louis W. Bullock, Patricia W. Bullock, of Bullock & Bullock, Tulsa, Okl., Richard C. Wallace, of Evans & Mullinix, Kansas City, Kan., for plaintiff Bank.

James S. Willis, Kansas City, Kan., Trustee.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, Chief Judge.

On February 9, 1989, this matter came for trial on the complaint of Commercial Bank and Trust Company of Tulsa (hereinafter "Bank") to determine the dischargeability of a debt pursuant to Title 11 United States Code section 523(a)(6). The plaintiff Bank appeared by and through counsel Louis W. Bullock, Pat Bullock, and Richard C. Wallace. The debtor/defendants, Robert Clair Noland and Marilyn Crouch Noland, appeared in person and by and through counsel, Charles Thomas and Eileen M. Smyth.

### FINDINGS OF FACT

After reviewing the testimony, the exhibits including depositions, the stipulations of the parties, the record, and the file, this Court finds as follows:

1. The plaintiff is Commercial Bank and Trust Co. of Tulsa, an Oklahoma state banking institution, formerly known as Commercial National Bank.

2. The defendant/debtors are Robert and Marilyn Noland. Robert C. Noland describes himself as a sophisticated businessman. He has a Masters degree in Business Administration; has worked for a bank; was the chief crude oil trader for BPM, Ltd. in Tulsa, Oklahoma; was an oil broker for Fuel Oil Supply in Houston, Texas; a real estate developer; and is presently district sales manager for Telex Computer Products. Marilyn Noland is a college graduate. She and her husband owned a retail business which sold home accessories in Tulsa, Oklahoma. Although she denies managing the business, she handled the payroll, signed loans and security agreements, and went to "market" as a buyer.

3. In June, 1979, the Nolands purchased a home located at 1393 E. 26 Place, Tulsa, Oklahoma. During the latter part of 1979 through early 1980, the Nolands extensively remodeled the property. In October, 1980, the Nolands obtained a loan from the

Fourth National Bank of Tulsa in the amount of $100,000. This loan was secured by a first mortgage encumbering the property.

4. In March of 1984, Robert and Marilyn Noland borrowed $188,000.00 from the plaintiff, Commercial National Bank, Tulsa, Oklahoma now known as Commercial Bank and Trust Company of Tulsa. This note was secured by a second mortgage on their home. The defendants conveyed a secured interest in the parcel of real estate:

[t]ogether with the *buildings* and improvements erected or to be erected thereon including *all fixtures and all the appurtenances* and all the rents, issues and profits arising and which may be had therefrom.

(Emphasis added). This mortgage was signed by both of the defendants, and properly filed and recorded.

5. The defendants defaulted on the note, and in March 1986, the Bank filed a foreclosure action against the defendants. The Bank agreed to delay seeking judgment and to allow the Nolands to continue to live in the house, provided they would attempt to sell the house. In February, 1987, Mr. Noland was offered a position in Kansas City. As a part of that relocation package, his employer arranged for a relocation company to purchase his home. The purchase price would be determined by an average of two appraisals.

6. In April, 1987, the house was appraised for purposes of setting the price the relocation company would pay for the house. Based upon these appraisals, the relocation company offered to purchase the home for $321,250.00.

7. The defendants provided the Bank with a proposed contract for sale of the property to a relocation company arranged by Mr. Noland's employer. The contract provided to the Bank reflected a sales price of $321,250.00 and included:

[a]ll fixtures and articles of personal property attached or appurtenant to or used in connection with the property ... are included in this sale. Without limitation, such fixtures and articles of personal property ... custom made draperies, drapery and curtain rods, bathroom and kitchen cabinets ... mantels.

This contract provided to Commercial Bank *did not* reflect that any items of fixtures and/or personal property were excluded from the sale. The acceptance of this offer would not have satisfied the Nolands' debt to the Bank.

8. The actual Contract of Sale with the relocation company, signed by the Nolands on June 5, 1987 and signed by the relocation company on August 20, 1987 (two days after the foreclosure judgment was entered), excluded certain fixtures from the sale. Specifically the contract excluded:

[C]ertain light fixtures (which will be replaced) some draperies, refrigerator, wood mantels, some hardware which will be replaced—*all exclusions were specified to both appraisers on sight.*

(Emphasis added). The contract exclusions did not include all of the items which the defendants removed from the house. More importantly, the appraisers were not told that defendants intended to remove all of the items listed.

9. At trial, the defendants testified that Mrs. Noland advised both appraisers that she disclosed their intention to remove the mortgaged property from the house. Mrs. Noland testified that she specifically mentioned the hand painted porcelain bowls in the bathrooms to both appraisers, and was told that removing these high end features from the house would not affect the value of the house. The Court finds this testimony not credible and inconsistent with the written appraisals.

10. The two appraisals reflect that the items removed from the house were not specified to both appraisers. The Michael Gray appraisal lists the "special features which affect the appraised value of the subject property ... marble fireplaces, marble vanities, hand painted sinks in baths." The only items specified in the Gray appraisal to be removed were "Owners have not determined what curtains and drapes will remain." Similarly, the Bird/Glass appraisal reflects that the items removed were not specified to the appraisers. The painted porcelain sinks and mar-

ble fireplaces were included as special features of the house which affect the value of the house. The appraisal states. that the estimated value included: "all drapes and blinds," and that the only items excluded from the appraisal were: "dining room, upstairs hall and entry light fixtures."

11. The defendants moved from Tulsa, Oklahoma to Overland Park, Kansas on or about August 10, 1987. The Nolands moved less than two weeks before foreclosure judgment was granted.

12. As the defendants moved out of the house on the eve of foreclosure, they stripped the house of mortgaged fixtures and personal property appurtenant to the real estate in which the bank had a valid and perfected security interest. Four interior doors were removed and not replaced. The door hardware on all of the interior and exterior doors, except the front door, was removed and not replaced. Three American Standard Lexington one-piece bone colored toilets were removed. They were replaced by track house quality white toilets leaving holes in the carpet around the base of the toilets. Polished brass toilet paper holders and towel racks were removed and not replaced leaving holes in the walls. Four travertine marble vanity tops were removed, along with five hand painted porcelain bowls and five polished brass lavatory faucets. These were replaced with plastic counter and bowls and plastic and chrome faucets. Brass and ceramic cabinet pulls were removed and either not replaced or replaced with inferior quality substitutes. Hand-carved walnut mantels were removed from four fireplaces and plain painted wood mantels were substituted. All of the light fixtures, except one bathroom fixture, were removed. The light fixtures purchased by Mrs. Noland's decorator, which included multi-light chandeliers and wall sconces, were replaced by inferior quality, tract-house fixtures. Draperies for six of the windows were removed, along with the drapery rods, leaving holes in the walls. Two roman shades and one balloon shade valance were likewise removed.

13. All of the items removed from the house were covered by the mortgage given to the bank by the Nolands. The Bank had a valid security interest in the property removed from the house by the defendants.

14. The mortgaged property was removed from the house without the permission of the Bank.

15. Some of the items were sold without permission of the Bank and the Bank was not given the proceeds of the sale.

16. At trial, defendants admitted they still have some of the secured property in their possession. Specifically, defendants presently have the toilets, doors, some door hardware, towel racks, toilet paper holders, drapes and roman shades, some cabinet pulls, the "brass chandelier, Spirey chandelier, master bedroom chandelier, and one of the five brass lights." Despite repeated requests by the Bank, defendants have refused to relinquish the property.

17. Just prior to the debtors stripping the house of the fixtures, they were given a firm offer of $321,250.00 for the house, free and clear of all liens. The Bank agreed to the sale, even though it would not clear the Nolands' indebtedness. The sale, though, was not closed because of other liens inferior to the Bank's, which the debtors were unable to get released. This offer was made by a relocation service hired by Mr. Noland's employer. The offer was based on the average of two independent appraisals. The offer was also based on the house being left substantially intact with the fixtures.

18. The Court finds that $321,250 is a fair valuation of the residence immediately prior to its being stripped of its fixtures.

19. At trial, the Bank called Jack Braswell as an expert in real estate values in the area of Tulsa, Oklahoma, where this house is located. Braswell is a realtor, who has specialized in the sale of real estate in this particular area of Tulsa for 25 years. He has some familiarity with this house, as well as particular knowledge about the valuation of real estate in this area of Tulsa during the time in question. He testified that the removal of the fixtures would impact on the value of the

house in the range of 10 to 12 percent. This would result in damages ranging from $32,125 to $38,550.

20. In fact, the house sold in February 1988 for $290,000, with the stipulation that the Bank would seek to recover the fixtures and restore them to the real estate. The difference in the sales price after removal of the fixtures and the fair valuation of the property before the removal of the fixtures and damage to the house is $31,250.

## CONCLUSIONS OF LAW

Section 523(a)(6) excepts from discharge a debt for "willful and malicious injury by the debtor to another entity or to the property of another." Although this section does not specifically mention conversion, Congress intended the term "willful and malicious injury" to include willful and malicious conversion. *In re Auto Outlet, Inc.*, 71 B.R. 674, 676 (Bankr.D.Utah 1987) (*citing* 124 Cong.Rec.H. 11096 (daily ed. Sept. 28, 1978); S. 17412 (daily ed. Oct. 6, 1978) (statement of Rep. Edwards & Sen. DeConcini)). The Bank contends that the debtors' stripping the house of the fixtures constituted a willful and malicious conversion of property in which it held a security interest.

The Court finds in this case, that a conversion occurred. The debtors do not deny that they stripped the house of fixtures in which the bank held a security interest for personal purposes. The issue before this Court is whether the conversion was "willful and malicious."

Initially, the Tenth Circuit defined the term as meaning "deliberate and intentional." *In re Compos*, 768 F.2d 1155, 1157 (10th Cir.1985). Here, the debtors' deliberate and intentional act of stripping the house of its fixtures and either selling or using the fixtures for personal purposes satisfies the *Compos* court's initial definition. They did not take the fixtures out by accident.

However, the Tenth Circuit in *Compos* severely tightened the scope of section 523(a)(6) and found that: "Section 523(a)(6) does not except from discharge intentional acts which cause injury; *it requires instead an intentional or deliberate injury. Id.* at 1158 (*citing In re Cecchini*, 37 B.R. 671, 674–75 (9th Cir. BAP 1984). Thus, the Tenth Circuit requires not only an intentional *act*, but also "intentional or deliberate *injury.*"

After reviewing the overwhelming evidence in this case, this Court finds that the Tenth Circuit's strict standard has been met. This Court finds by clear and convincing evidence that the debtors willfully and maliciously converted the Bank's collateral. The debtors knew the items were mortgaged property and that conversion would injure the Bank. The debtors are experienced business persons; Mr. Noland, in addition to being an MBA and a real estate developer, worked for a bank, and he considered himself a "sophisticated businessman."

In addition, the defendants attempted to conceal from the bank the conversion and sale of the property. Even after being confronted with the problem, the Nolands refuse to return some of the items. The debtors have also failed to identify to whom the secured property was sold and/or the amount of the proceeds.

The only question left to be resolved is the amount of damages. The parties stipulated in this case that the amount of damages must be shown by the decrease in the value of the bank's collateral, the home as a whole, rather than by the lost value of each particular fixture.

This Court has found that $321,250 is a fair valuation of the residence immediately prior to its being stripped of its fixtures. The creditor called Jack Braswell as an expert in real estate values in the area of Tulsa where this house is located. Braswell is a Realtor who has specialized in the sale of real estate in this particular area of Tulsa for 25 years. He has some familiarity with this house, as well as particular knowledge about the valuation of real estate in this area during the time in question. He testified that the removal of the fixtures would impact on the value of the house in the range of 10 to 12 percent. Mr.

Braswell's opinion is supported by the fact that the house actually sold in February, 1988 for $290,000, or $31,250 less, with the stipulation that the Bank would seek to recover the fixtures and restore them to the real estate.

This court finds the creditor's evidence persuasive and finds damages in the amount of $31,250.00.

IT IS THEREFORE, BY THE COURT, ORDERED That judgment on the complaint of Commercial Bank & Trust Company of Tulsa objecting to the dischargeability of its debt is granted in favor of the plaintiff and against the debtor/defendants, Robert Clair Noland and Marilyn Crouch Noland in the amount of $31,250.00 plus the statutory rate of interest from the date of this order.

IT IS FURTHER, BY THE COURT, ORDERED That the plaintiff's request for punitive damages is denied.